FILED
2008 Feb-04  AM 10:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

VERNON R. ISBELL,

       Plaintiff,

v.                             CV 06-J-1478-NW

MICHAEL ASTRUE,
Commissioner of Social
Security,

       Defendant.

### MEMORANDUM OPINION

This matter is before the court on the record and briefs of the parties.  This court has jurisdiction pursuant to 42 U.S.C. § 405.  The plaintiff is seeking reversal of a final adverse decision of the Commissioner of Social Security denying his claim that he was entitled to disability insurance benefits and supplemental security income.

The court has considered the record and briefs of the parties.  For the reasons set forth herein, the decision of the Commissioner is due to be **REVERSED**.

1

## Procedural History

On August 29, 2003, the claimant filed applications for disability insurance benefits and supplemental security income payments (R. 451).  The claim was denied initially and a request for hearing was timely filed (R. 47, 458).  A hearing was held on April 7, 2005, at which the plaintiff and a vocational expert ("VE") testified (R. 577-596).  The hearing was continued so that the plaintiff could have a consultative evaluation performed by a neurologist to determine the dexterity in his arms and hands (R. 587-88).  Following the consultative evaluation, a second hearing was held on October 11, 2005, at which the plaintiff and a VE testified (R. 550-75).  The ALJ held that the plaintiff was not disabled and that the plaintiff had the residual functional capacity to perform a significant range of light work (R. 35).  The plaintiff subsequently appealed the ALJ's ruling arguing that it was not supported by substantial evidence (doc. 1).

## Factual Background

The plaintiff is a fifty year old man who was employed as a mobile home repairman until he injured his neck and back (R. 87, 580-81).  The plaintiff alleges that he is disabled due to severe osteoarthritis in the right knee, two deteriorated

2

discs in the lower back, a bone spur in his right hip, numbness and tingling in his arms and fingers, and glaucoma.  (R. 114-15, 579-80)

The plaintiff alleges that he became disabled while doing some underpinning on a mobile home (R. 581).  The plaintiff states that while he was squatting down to do the work in May of 2003, his right knee popped and he felt a sharp pain in his knee (R. 581).

The plaintiff's knee and back injuries did not begin in May of 2003, however.  The plaintiff's knee and back problems date back to 1976, when he was serving in the Air Force (R. 591-92).  On August 31, 1976, the plaintiff injured his knee and back when he fell off a telephone pole while doing wiring and tenant maintenance (R. 592).  An examination at that time showed that there was a moderate amount of chondromalacia of the right knee (R. 351).  The treating physician recommended that the plaintiff avoid sitting, squatting, and climbing, and also that he be trained in an area other than pole climbing (R. 351-52).  Subsequent examinations show that the chondromalacia had become severe in his right knee (R. 345-47).  In 1978, he underwent knee surgery and afterwards was given restrictions of no running, no strenuous exercises, no standing for more than ninety minutes, and no marching or climbing (R. 353, 354).  The plaintiff's back was also injured in the fall, but a year later the doctors found that a disk had

degenerated (R. 544). Because of his injuries, the plaintiff could not go back to work in wiring and tenant maintenance (R. 592). The Air Force attempted to cross-train the plaintiff to work in an office (R. 592). The plaintiff was discharged from the Air Force on June 30, 1981, because he could not function working in an office (R. 592-94).

In 1994, the plaintiff reported pain in both knees (R. 341-43). An examination revealed crepitus in both knees, worse on the right (R. 342). The plaintiff was advised to take Ibuprofen for the pain and Tylenol # 3 if the pain woke him up (R. 341). In 1997, the plaintiff went to Dr. Melson complaining of pain in his knees, right hip, and lower back (R. 164). Dr. Melson diagnosed the plaintiff with lumbar radiculopathy, possible bursitis in his right hip, and moderate degenerative arthritis in his right knee (R. 165). In 1998, the plaintiff was seen by Dr. Morgan with the Department of Veterans Affairs ("VA") for back and knee pain (R. 545-46). Dr. Morgan diagnosed the plaintiff with alleged degenerative joint disease of the lumbosacral spine, and chondromalacia of the right knee with slight loss of function due to pain (R. 545-46, 548).

The plaintiff was next seen in June of 2003 by Dr. Murrill of the VA for increased lower back pain (R. 184-86). The plaintiff reported that his pain level was a 10/10 (R. 185). The plaintiff was diagnosed with low back pain

4

exacerbations, most likely spasms (R. 186).  To treat his increased pain, the plaintiff was prescribed Oxycodone and Robaxin (R. 186).  Following his examination by Dr. Murrill, the plaintiff was seen by Dr. Maze, an orthopedist (R. 180).  Dr. Maze found that the plaintiff suffered from acute and chronic lower back pain, chronic right knee pain, and chronic right hip pain (R. 181).

In August of 2003, the plaintiff fell down a flight of steps (R. 155).  The examining doctor noted that previously, a VA doctor thought that both of the plaintiff's knees and his right hip needed to be replaced (R. 155).  The plaintiff was diagnosed with degenerative joint disease in his knees and hips (R. 155).  In September of 2003, the plaintiff was examined by a neurological surgeon named Dr. Adderholt (R. 142-43).  The plaintiff complained of back, neck, and hip pain, as well as worsening right groin pain and worsening paresthesias and numbness in his upper extremities (R. 142).  Dr. Adderholt stated that the plaintiff's upper extremity paresthesias was likely related to either ulnar neuropathy or carpal tunnel syndrome and that his back pain was likely degenerative (R. 142).  Pursuant to Dr. Adderholt's recommendation, the plaintiff underwent a myelogram and a post myelogram CT scan of his cervical and lumbar spine (R. 143-49).  The lumbar myelogram revealed degenerative disc disease at L5-S1, but no evidence of a herniated nucleous pulposus ("HNP") (R. 144).  The lumbar CT scan showed

bulging annulus fibrosis with posterior osteophytes at L5-S1 (R. 148).  The

cervical myelogram revealed a right sided HNP at C5-C6 with bulging disc and

posterior osteophytes at C4-C5 (R. 146).  Finally, the cervical CT scan showed an

old right-sided HNP with lipping osteophyte at C5-C6 with an old left-sided HNP

at C4-C5, but no evidence of acute abnormality (R. 149).  After reviewing these

tests, Dr. Adderholt found that the plaintiff's back and neck pains were

degenerative in origin and referred him to the pain clinic for further treatment (R.

141).

In October of 2003, the plaintiff was examined by Dr. Morgan of the VA

(R. 197).  Dr. Morgan found marked objective evidence of painful motion, spasm,

weakness, and tenderness (R. 198).  Dr. Morgan also observed that the plaintiff

"gets in and out of a chair with great difficulty and he walks with a cane poorly

and very slowly" (R. 198).  Dr. Morgan's diagnosis was that the plaintiff suffered

from post traumatic degenerative joint disease of the thoracic and lumbar spine

with loss of function due to pain and post-surgical degenerative joint disease of

the right knee with loss of function due to pain (R. 198).

The plaintiff was sent to Dr. Haney, a psychologist, for a consultative

examination on December 18, 2003 (R. 208-09).  Dr. Haney found the plaintiff's

intelligence to be in the low average range (R. 208).  The plaintiff stated to Dr.

Haney that he was depressed due to physical problems and complained of poor sleep and low energy and appetite (R. 208). Dr. Haney diagnosed the plaintiff with moderate to severe depression and pain disorder associated with both psychological factors and general medication condition (R. 209). Dr. Haney found that the plaintiff's "ability to function in most jobs appeared moderately to severely impaired by the [plaintiff's] physical and emotional problems" (R. 209).

In March of 2004 the plaintiff underwent an independent living/rehabilitation technology assessment (R. 437-40). The evaluator reported that the plaintiff had great difficulty entering and exiting his mobile home (R. 437, 439). The plaintiff stated that he was afraid to drive because he was concerned that his legs would go numb while he was driving and he would be unable to operate the car (R. 439). The plaintiff also stated that he was afraid to shower and toilet alone (R. 437). The plaintiff reported that his wife has to dress him and tie his shoes (R. 438). Based on these findings the evaluator recommended a number of things that would help the plaintiff function like a raised toiled seat and a ramp into his mobile home (R. 438).

In May of 2004, the plaintiff was given a combined service connected disability rating of 40% by the VA (R. 359). In June of 2004, the plaintiff underwent testing with a vocational evaluation coordinator to determine his

employability (R. 444-49). The vocational evaluation coordinator's report states that the plaintiff tested at a 11.5 grade level with weaknesses in math and language expression skills (R. 447). The report states that "Mr. Isbell would currently encounter difficult meeting the demands of a regular work schedule due to his numerous physical restrictions. His stated vocational interest of gaining employment in an outdoor occupation would definitely be non-feasible from a diagnostic vocational evaluation perspective due to work demands." (R. 448). The report recommended that the plaintiff "avoid activities requiring heavy lifting and carrying, climbing, frequent reaching and ranging above head level, constant pushing and pulling, riding for extended periods, sitting or standing for a long duration, and continuous use of medium to fine dexterity skills" (R. 448).

In May of 2005, the plaintiff's disability rating was increased to 70% (R. 373, 376-77). However, the plaintiff was granted 100% disability because he was completely unable to work due to his service connected disabilities (R. 373). The VA evaluated how the plaintiff's impairments contributed to his disability as follows: (1) degenerative disc disease of the thoracic spine, T12-L1, is 20% disabling; (2) degenerative disc disease of the lumbar spine, L5-S1 is 30% disabling; (3) chondromalacia of the right knee status post patellaplasty and chondroplasty is 30% disabling; and (4) post surgical degenerative joint disease of

his right knee is 20% disabling (R. 376-77).

In April 2005, the plaintiff was seen by a VA Psychiatric Nurse Practitioner/Clinical Nurse Specialist to address the plaintiff's mental health issues (R. 411-14).  The plaintiff reported to the Nurse Practitioner that he had recently been told that he was "not physically able to perform manual labor type employment due to his [service connected] disabilities."  (R. 411).  The plaintiff also reported that he was under a lot of pressure financially and that he had recently had to deal with a son who had a gambling problem (R. 411).  The Nurse Practitioner diagnosed the plaintiff with a mood disorder, depressed, due to his general medical condition and gave him a Global Assessment of Functioning ("GAF") Score of 40 (R. 412).

On August 1, 2005, the plaintiff went to the VA Eye Ophthalmology Clinic for a follow-up examination (R. 392).  The plaintiff was diagnosed with possible glaucoma (R. 393).

On September 19, 2005, the plaintiff was seen by a VA Psychiatric Nurse Practitioner/Clinical Nurse Specialist (R. 386-89).  The plaintiff reported that his depression and anxiety were doing "o.k." (R. 386).  The VA nurse practitioner reported that the plaintiff's affect was bland and that his mood was dysthymic and anxious (R. 386).  The plaintiff was diagnosed with mood disorder, depressed, due

9

to general medical condition, chronic pain in back, hips, and knee and given a

Global Assessment of Functioning ("GAF") score of 45 (R. 387).

At the first hearing, the ALJ took testimony from a vocational expert ("VE")

(R. 589).  The plaintiff's past relevant work was as a vending machine attendant,

newspaper carrier, truck driver, yard worker, and mobile home service utility

worker (R. 589-90).  The VE stated that the plaintiff had no transferable skills to

less than medium exertional level work (R. 590).  Based on the ALJ's hypothetical

question, which assumed an individual limited "to no more than sedentary work

but has impairments to the upper extremities where he's limited to less than

occasional reaching, handling, grasping, fingering, and feeling," the VE statedan

individual would be precluded from all of the plaintiff's past work or any work to

which his acquired skills would be transferable (R. 590).  The VE further testified

that such an individual would be precluded from sedentary work because

sedentary work requires good, fine use of the hands (R. 591).  The first hearing

was closed so that the plaintiff could be evaluated by a neurologist (R. 587-88,

595).

The plaintiff was evaluated by Dr. Norwood on May 18, 2005 (R. 362).  Dr.

Norwood found that the plaintiff could stand for one hour, walk for a half hour

and sit up to four hours at a time (R. 364).  Dr. Norwood also found that the

plaintiff could lift and carry ten pounds constantly, fifteen pounds frequently, and twenty-five pounds occasionally (R. 364).

Following the plaintiff's evaluation by Dr. Norwood, a second hearing was held (R. 550-75).  The plaintiff testified that he could not lift a gallon jug or grip a hammer or screwdriver because of nerve damage (R. 556).  The plaintiff blamed his inability to lift a gallon jug or grip and screwdriver or hammer on a nerve in his elbow that he jammed in 1981 (R. 556).  The nerve had to be surgically repaired by taking the nerve out of his elbow and laying it in the palm of his hand (R. 556).  The plaintiff testified he does not have the strength in his elbow or wrist to push himself out of a chair (R. 557).

The plaintiff testified that about once a month his back will give him problems and he has to lie down for twenty-four to thirty-six hours (R. 558).  The plaintiff takes oxycodone to deal with his back when it flares up (R. 562).

A VE also testified at the second hearing (R. 570).  The ALJ asked the VE whether the plaintiff could engage in a reduced range of sedentary or light work if the limitations described in Dr. Norwood's report were correct (R. 570).  The VE responded that the limitations in Dr. Norwood's report would allow for a broad range of light work that allows for alternately sitting and standing as well as a full range of unskilled, sedentary work (R. 570).  The VE stated that if the plaintiff had

to take frequent breaks, that would preclude his ability to sustain any gainful employment (R. 572).  The VE also stated that if the plaintiff could not sit or stand for eight hours, then that would preclude his ability to sustain any gainful employment (R. 573).

## Standard of Review

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied.  42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990).  "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir.1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983).

In determining whether substantial evidence exists, this court must scrutinize the record in its entirety, taking into account evidence both favorable and unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir.1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir.1987).

"Even if [the Court] find[s] that the evidence weighs against the Commissioner's decision, [the Court] must affirm if the decision is supported by substantial evidence." *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). This court must also be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir.1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993).

This court may not decide facts anew, reweigh evidence or substitute its judgment for that of the ALJ, even if the court finds that the weight of the evidence is against the Commissioner's decision. *Martin*, 894 F.2d at 1529. This court must affirm the decision of the ALJ if it is supported by substantial evidence. *Miles*, 84 F.3d at 1400; *Bloodsworth*, 703 F.2d at 1239. However, no such presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F. 2d 1233, 1235 (11th Cir. 1991); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).

## Discussion

The ALJ held that the plaintiff had the following combination of severe impairments: chondromalacia of the right knee, mild degenerative disc disease of

13

the lumbar spine, obesity, migraine headaches, mild arthritis of the right shoulder, anthralgias of the left knee, depression, and diabetes (R. 28). The ALJ further found that none of the plaintiff's impairments, either singly or in combination, met or medically equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (R. 28-29). The ALJ considered the plaintiff's complaints of chronic pain, numbness, tingling, need to lie down/rest, inability to grip, and the plaintiff's other alleged limitations, but found them not to be supported by the objective medical evidence (R. 29).

The ALJ found that the plaintiff's depression/mood disorder was not severe and only resulted in minimal limitations (R. 29). The ALJ found that the plaintiff had the residual functional capacity ("RFC") as assessed by Dr. Norwood (R. 32). In making this finding, the ALJ gave little weight to all of the medical evidence except for Dr. Norwood's findings and the findings of the state agency medical consultant (R. 32).

The ALJ failed to either cite to or properly apply the three part pain standard that must be applied when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that

14

condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *See Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir.1986); *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991).  The medical evidence confirms that the plaintiff does have underlying medical conditions, those being severe chondromalacia of the right knee and degenerative disk disease (R. 345-47, 141-148).  A lumbar myelogram conducted in September of 2003 revealed degenerative disc disease at L5-S1 (R. 144).  A lumbar CT scan showed a bulging annulus fibrosis with posterior osteophytes at L5-S1 (R. 148).  A cervical myelogram revealed a right sided HNP at C5-C6 with bulging disc and posterior osteophytes at C4-C5 (R. 146).  Finally, a cervical CT scan showed an old right-sided HNP with lipping osteophyte at C5-C6 with an old left-sided HNP at C4-C5 (R. 149).  Such testing is "objective medical evidence" that confirms that the condition is of such severity that it can be "reasonably expected to give rise to the alleged pain." *See Holt*, 921 F.2d at 1223.  Indeed, in October of 2003, Dr. Morgan of the VA noted that "there is marked objective evidence of painful motion, spasm, weakness, and tenderness." (R. 198).

   This court finds the plaintiff's subjective complaints of pain to be credible and equivalent to the pain expected by his ailments.  *See Foote v. Chater*, 67 F.3d

1553, 1561 (11th Cir.1995).  Subjective pain testimony supported by objective medical evidence of a condition that can reasonably be expected to produce the symptoms of which the plaintiff complains is sufficient to sustain a finding of disability.  *Johns v. Bowen,* 821 F.2d 551, 557 (11th Cir.1987).  This court finds an abundance of evidence, detailed above, to support the plaintiff's subjective complaints of pain.  There is not one instance in the extensive medical record where a doctor has suggested that the plaintiff is a malingerer or is exaggerating his pain.

The ALJ also erred by failing to give proper weight to the VA's disability determination.  On May 26, 2005, the VA increased the plaintiff's disability rating from 50% to 100% (R. 372-81).  That rating is based on the plaintiff's degenerative disk disease in the thoracic and lumbar spine, chondromalacia in the right knee, and post-surgical degenerative joint disease in the right knee (R. 376-77).  In his decision, the ALJ discusses the plaintiff's disability rating, but gives it little weight on the basis that the VA criteria for disability differ from that used by the Social Security Administration (R. 31).

Although a VA disability rating is not binding on the Secretary, it is evidence that should be given great weight.  *Olson v. Schweiker*, 663 F.2d 593, 597 n. 4 (5th Cir. 1981).  The different criteria employed to evaluate claims by the

16

VA and the SSA is not sufficient justification for not according great weight to the disability determination of the VA. *Hogard v. Sullivan*, 733 F. Supp. 1465, 1468 (M.D. Fla. 1990). In this case, the ALJ has failed to offer persuasive, specific, valid reasons for according little weight to the VA's finding that the plaintiff is 100% disabled. *See McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). For example, the ALJ has not attempted to show that the VA's records do not support the VA's disability rating. *See Scifers v. Commissioner of Social Security*, 158 Fed. Appx. 16, 17 (9th Cir. 2005) ("The ALJ in this case properly accorded less weight to the VA's disability rating, after explaining that the medical evidence does not support a finding of disability under the SSA's definition").

The court finds that the VA's rating was entitled to great weight because that rating is based on the thirty year treatment relationship between the plaintiff and the VA doctors. Had the VA rating been given great weight, the ALJ would have determined that the plaintiff's residual functional capacity was far less than Dr. Norwood prescribed.

## Conclusion

When evidence has been fully developed and unequivocally points to a specific finding, the reviewing court may enter the finding that the Commissioner should have made. *Reyes v. Heckler*, 601 F.Supp. 34, 37 (S.D.Fla.1984). Thus, this court has the

authority under 42 U.S.C. §405(g) to reverse the Commissioner's decision without remand, where, as here, the Commissioner's determination is in plain disregard of the overwhelming weight of the evidence.  *Davis v. Shalala*, 985 F.2d at 534; *Bowen v. Heckler*, 748 F.2d 629, 636 (11th Cir.1984).  Based on the lack of substantial evidence in support of the ALJ's findings, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED.**   This case is **REMANDED** to the Agency to calculate the plaintiff's monetary benefits in accordance with this Opinion.

**DONE** and **ORDERED** the 4th day of February 2008.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE